AO 106 (Rev. 04/10) Application for a Search Warrant

AUTHORIZED AND APPROVED/DATE: s/Mary E. Walters 1/28/2026

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

FILED JAN 30 2026 JOAN KANE, CLERK U.S. DIST. COURT, WESTERN DIST. OKLA. BY [initials], DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

An Amazon Tablet, Black in Color, Model L5SB3A, currently in the custody of the FBI located at 3301 W. Memorial Road, Oklahoma City

Case No. M-26-52-ALM

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 2251(a)(b)(c) | Sexual Exploitation of Children |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

NICHOLAS MILLER, Special Agen (BIA)
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/30/26

[signature: Amanda L. Maxfield]
*Judge's signature*

City and state: Oklahoma City, Oklahoma

AMANDA L. MAXFIELD, U.S. Magistrate Judge
*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | **No. M-26- -ALM** |
| **SEARCH WARRANT** | ) | |

**SEARCH WARRANT AFFIDAVIT**

I, Nicholas Miller, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device described in attachment A—which is currently in law enforcement's possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Bureau of Indian Affairs ("BIA"). I have been a law enforcement officer for 17 years as a police officer, police canine handler, and supervisory police officer while employed with various law enforcement agencies. I attended the Oklahoma Council on Law Enforcement Training ("CLEET") for basic police training. I attended the Federal Law Enforcement Training Center ("FLETC") at the Bridge Indian Police Academy ("IPA") for basic Indian country police officer training. I also attended FLETC for the Department of the Interior Investigator Training Program ("DOI ITP"). For the past 15 years, I have been employed with the BIA, Office of Justice Services ("OJS"). I am currently a Special Agent assigned to District II in Oklahoma. I am also a member of to the Federal Bureau of Investigations ("FBI") Safe Trails

Taskforce as a Task Force Officer ("TFO"). My primary duties as a Special Agent are to investigate felony criminal offenses, which occur within the boundaries of the Indian reservations to which I am assigned. During my time as a Special Agent, I have taken part in numerous criminal investigations as the primary investigator or in a backup capacity. I have also received significant training in criminal investigations, including investigations into violent crimes. As a Special Agent with the BIA, I am a law enforcement officer of the United States and empowered by law to conduct investigations of and to make arrests for violations of Federal law, including violations of the Major Crimes Act ("MCA"). Also, based on my training and experience, I am familiar with internet, cell phones and social media resources and how they can assist law enforcement in criminal investigations. My investigative experience includes interviewing victims and witnesses, as well as conducting searches of physical locations, social media, cell phone information, and electronic devices pursuant to court order or consent. I have been trained in how to seek information using various court orders such as search warrants. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 2252(a)(2), 2252(a)(4)(B), and 2251. I know that Title 18, United States Code, Section 2251 makes it a crime to produce material depicting the sexual exploitation of a minor (child pornography) and that Section 2252(a)(4)(B), makes it a crime to possess child pornography. I know that Title 18, United States Code, Section 2252(a)(2), makes it a crime to receive or distribute material depicting the sexual exploitation of a minor. I have gained expertise

in the conduct of such investigations through training in the area of child pornography and child exploitation investigations in seminars, classes, and everyday work related to conducting these types of investigations, and I have had the opportunity to observe and review numerous examples of child pornography in a variety of media, including computer media.

3. Based on the facts set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 2251(a)(b)(c): Sexual Exploitation of Children, 18 U.S.C. § 2252: Certain Activities Relating to Material Involving the Sexual Exploitation of Minors, 18 U.S.C. § 2252A: Certain Activities Relating to Material Constituting or Containing Child Pornography, 18 U.S.C. § 2425: Use of Interstate Facilities to Transmit Information About a Minor, and 42 U.S.C. § 13032: Reporting of Child Pornography by Electronic Communication Service Providers, (the "Target Offenses") has been committed, are being committed, and/or will be committed by DYLAN MATTHEW WALKER (WALKER). There is also probable cause to search the device described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

4. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE AND BACKROUND

5. On July 2, 2025, Chickasaw Nation Lighthorse Investigation were assigned cyber tip #205623155 from the National Center for Missing and Exploited Children (NCMEC). The cyber tip alleged the presence or transfer of Child Sexual Abuse Material (CSAM) over the internet. A total of 7 files had been uploaded and shared via Kik Messenger from an individual,

with a display name of "Dylan Walker," using a screen/username of "dmwalker1999" and the email address listed as "dylan_w9@icloud.com". The child sexual abuse material was shared in a private chat message to another unidentified user.

6. On July 2, 2025, Chickasaw Nation Investigations reviewed cybertip #205623155 that involved the Kik account with username "dmwalker1999", a home email address of "dylan_w9@icloud.com", and an IP address of 67.60.194.106. OSBI ICAC analysts were able to conduct an IP Geo lookup of the suspects IP address, and it returned to an address in Ada, OK.

7. On July 3, 2025, Chickasaw Nation Investigations reviewed the files that were shared by WALKER via Kik messenger. One video showed a prepubescent male fully naked and alone in a bedroom (duration 1 minute, 29 seconds), a second video showed a fully naked prepubescent male, with an erect penis, sitting on top of a naked adult male, also with an erect penis (duration 13 seconds), the last video showed a prepubescent male laying on a chair with his legs in the air, his pants off and wearing a blindfold. The prepubescent male had a black anal toy in his rectum and was being masturbated by an unknown individual (duration 44 seconds). According to the cybertip, these videos were uploaded and shared by WALKER to an unidentified person on January 25, 2025, via Kik messenger.

8. On July 3, 2025, Chickasaw Nation Investigation requested and obtained a Multi-County Grand Jury Subpoena, which was sent to the internet provider, Cable One Inc. The subpoena requested registered subscriber information. That subpoena return listed the subscriber information as Darrell Walker (suspect's father) with a listed address of 13012 County Rd. 3520, Ada, OK 74820.

9. On July 8, 2025, Chickasaw Nation Investigations conducted an online search of WALKER using various law enforcement databases, and were able to locate the suspect's identifying information, DYLAN MATTHEW WALKER (WALKER) (DOB XX/XX/1999); an enrolled member of the Chickasaw Nation Tribe, a federally recognized Indian tribe, and who has a certified degree of Indian blood. Also located was a possible phone number associated with WALKER: (580) 399-6420. That number is currently in use by WALKER. Chickasaw Nation Investigations were also able to identify the following address for WALKER, 13012 County Rd. 3520, Ada, OK 74820. This address is also on WALKER's driver license information, which was verified via Oklahoma Law Enforcement Telecommunications System (OLETS). This Address is located within the boundaries of the Chickasaw Nation and in the Eastern District of Oklahoma.

10. On October 9, 2025, a federal search warrant was executed on the above location. Inside the residence located in WALKER's room were the following electronic devices: Apple iPhone Silver in Case powered on, Silver Lenovo Laptop, Older Black Touchscreen Phone powered off, Apple iPhone White in a Black Case that appeared to be Cracked, and 1 USB.

11. Within the residence located in a common area was a Silver Laptop, and a Black Tablet. All listed items were seized as evidence.

12. WALKER was interviewed while the search warrant was being conducted. WALKER was read is Miranda Rights and agreed to speak without a lawyer present.

13. During the interview he stated he mainly communicates using text or Telegram. He stated he uses his cell phone to communicate and only uses his laptop for schoolwork.

14. WALKER stated he does not remember sending the videos. He stated he did not know you could send videos on Kik.

15. Law enforcement asked WALKER if the videos would be found on his devices. Walker then admitted to deleting them. He stated the video was sent to him. He stated he did not search them out and it's not something he is into. When asked about uploading and sharing videos he stated he didn't know he shared any of them on Kik.

16. When asked what would be found on the phone, WALKER responded with "nothing, I think." WALKER stated he did not remember getting Child Porn on Kik. He stated he remembers getting videos that were questionable on Kik. He stated when he got them, he would tell his parents and ask them to pray with him because he knew it was illegal. WALKER stated he told his parents he heard the screams and saw the incidents involving the kids. He stated it mortified him, and he could not handle it. He again stated the videos were sent to him.

17. WALKER stated he may have shared some of the videos on Telegram, but he did not remember sending them on Kik. WALKER stated it had just been on his phone.

18. The devices described in attachments A and B were located within the residence with WALKER. Walker provided law enforcement with the passcode only to the device described as the Apple iPhone 13 Pro Max, White in color evidence item number 1B1.

19. Based on the information received thus far, there is probable cause to believe Dylan M. Walker is in violation of 18 U.S.C. 2252A(5)(B), crimes committed in Indian Country involving the distribution, possession, and procurement of child pornography.

20. The following definitions apply to this Affidavit and Attachment B:

21. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

22. "Child Pornography" includes any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction was a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. See 18 U.S.C. § 2256(8).

23. "Computer" refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." See 18 U.S.C. § 1030(e)(1).

24. "Computer hardware" consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display

monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

25. "Computer passwords and data security devices" consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

26. "Computer-related documentation" consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

27. "Computer software" is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

28. "Internet Service Providers" (ISPs), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name B a username or screen name, an "e mail address," an e mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an ISP over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password. ISPs maintain records ("ISP records") pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format.

29. “Internet Protocol address” or “IP address” refers to a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet.

IP addresses might also be static, if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

30. "Minor" means any person under the age of 18 years. See 18 U.S.C. § 2256(1).

31. "Sexually explicit conduct" applies to visual depictions that involve the use of a minor, see 18 U.S.C. § 2256(8)(A), or that have been created, adapted, or modified to appear to depict an identifiable minor, see 18 U.S.C. § 2256(8)(C). In those contexts, the term refers to actual or simulated (a) sexual intercourse (including genital, oral-genital, or oral-anal), whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic areas of any person. See 18 U.S.C. § 2256(2)(A).

32. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

33. "Electronic Communication Service" refers to any service which provides to users thereof the ability to send or receive wire or electronic communications. (See Title 18 U.S.C. § 2510(15)).

34. "Hash Value" is a mathematical value generated by applying an algorithm to a computer file that is represented by a sequence of hexadecimal digits. Among computer forensics professionals, a hash value is generally considered to be a unique signature or fingerprint for a file.

35. The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); mechanical form (including, but not limited to, phonograph records, printing, typing); or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic digital media.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO EXHIBIT A SEXUAL INTEREST IN CHILDREN AND INDIVIDUALS WHO DISTRIBUTE, RECEIVE, POSSESS, AND/OR ACCESS WITH INTENT TO VIEW CHILD PORNOGRAPHY

36. Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who distribute, receive, possess, and/or access with intent to view child pornography:

a. Such individuals who collect child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

b. Such individuals who collect child pornography may collect explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. The majority of these individuals may also collect child erotica, which may consist of images or text that do not rise to the level of child pornography, but which nonetheless fuel their sexual fantasies involving children.

c. Such individuals who collect child pornography may often seek out like-minded individuals, either in person or via the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. The different internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, peer-to-peer, e-mail, bulletin boards, internet relay chat, newsgroups, instant messaging, and other similar vehicles.

d. Such individuals who collect child pornography may maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals rarely destroy these materials because of the psychological support they provide.

e. Such individuals who collect child pornography often may collect, read, copy or maintain names, addresses (including e-mail addresses), phone numbers,

or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or on scraps of paper.

f. Individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect their collection of illicit materials from discovery, theft, and damage. However, some individuals may dispose of their collection of their sexually explicit materials or only seek them out when they want to view them in order to conceal their activities for fear of being caught.

g. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

h. Based on my training and experience and speaking with other law enforcement officers, I know that such individuals have taken their electronic devices and storage media, which contain their collections of child pornography, with them when they have moved or changed residences.

i. Importantly, evidence of child pornography, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.

**BACKGROUND ON COMPUTERS/ELECTRONIC DEVICES AND THE INTERNET**

37. I have been trained in the investigation of crimes involving the sexual exploitation of children. I also own my own computer, have personal knowledge of the operation of a computer, and have accessed the Internet for numerous years. Based on this training and knowledge, and the experience of other law enforcement personnel involved in this investigation, I know the following:

38. Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. It has also revolutionized the way in which using cameras and film (either still photography or movies.) The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To

distribute these on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contact, mailings, and telephone calls. Any reimbursement would follow these same paths.

39. The development of computers has added to the methods used by child pornography collectors to interact with and sexually exploit children. Computers serve four functions in connection with child pornography. These are production, communication, distribution, and storage.

40. Cell phones and more advanced devices known as "smart phones" function the same as computers and can run computer software and applications, create and edit files, go on the Internet, chat, text, email, and interact with others on the Internet, and store, send, and receive files, among other functions. Cell phones and smart phones have been used by child pornographers to send, receive, store, and produce images depicting child pornography, as well as engage in voice, email, text, and real time chat conversations with minors and others. Cell phones and smart phones can contain SD cards and/or SIM cards that can store data such as pictures, videos, text messages, contact lists, call logs and other data.

41. GPS, or Global Positioning System, devices can be portable devices used to obtain directions to destinations or show roads and directions in a given area. GPS devices can store the route an individual traveled. GPS devices have been used by individuals to obtain directions when they travel to meet a minor for sexual purposes.

42. Child pornographers can convert photographs into a computer-readable format

with a device known as a scanner. With the advent of digital cameras, the images can now be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTP) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

43. Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Google, Yahoo!, Hotmail, Sky Drive or One Drive, and Dropbox among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer or device, such as a cell phone or "smart phone", with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer devices in most cases.

As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be

intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains peer to peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

44. Individuals involved in the sexual exploitation of children can produce sexually explicit images of children using a wireless device such as a cell phone. Photos can also be made using cameras, then can be transferred onto another device either using wire or wireless technology. Images can also be uploaded to Internet-based storage commonly referred to as the "cloud." Hard-copy images can also be scanned into a computer. Via the Internet, connection can be made to literally millions of computers around the world. Sexually explicit images of children can be transferred quickly and easily via electronic mail or virtually countless other online platforms, communication services, storage services, and applications.

A computer's capability to store images in digital form makes it an ideal repository for child sexual abuse material (CSAM) and other files related to the sexual abuse and exploitation of children. The digital-storage capacity in devices and in the "cloud" has grown tremendously within the last several years. Thumb drives with a capacity of 32 gigabytes are not uncommon.

Flash cards with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon. Phones with over 100 gigabytes in storage are not uncommon. Devices can store thousands of images and videos at very high 10 resolution. These devices are often internet capable and can not only store but can transmit images via the internet and can use the devices to store images and documents in internet or "cloud" storage spaces. Once this is done, there is no readily apparent evidence at the "scene of the crime." Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

45. The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion. With Internet access, a computer user can transport an image file from the Internet or from another user's computer to his own computer, so that the image file is stored in his computer. The process of transporting an image file to one's own computer is called "downloading." The user can then display the image file on his computer screen and can choose to "save" the image on his computer and/or print out a hard copy of the image by using a printer device (such as a laser or inkjet printer). Sometimes the only method to recreate the evidence trail of this behavior is with careful laboratory examination of the computer, modem, printer, and other electronic devices.

46. Your Affiant knows from training and experience that search warrants of digital media involved in computer or digitally related criminal activity usually produce items that tend to establish ownership or use of digital devices and ownership, or use of any Internet service

accounts accessed to obtain child sexual abuse material to include credit card bills, telephone bills, correspondence and other identification documents.

47. Your Affiant knows from training and experience that search warrants of digital media/ email accounts usually reveal items that tend to show dominion and control of the digital media/ account searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

**SEARCH METHODOLOGY TO BE EMPLOYED**

48. To search for electronic data contained in computer, phone, or electronic device hardware, computer, phone, or electronic device software, and/or memory storage devices, the examiners will make every effort to use computer forensic software to have a computer search the digital storage media. This may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

a. searching for image files to locate images of children engaging in sexually explicit conduct, examining log files associated with the receipt, transmission, and viewing of such images, and examining all of the data contained in such computer hardware, computer software, and /or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

b. surveying various file directories and the individual files they contain;

c. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set

forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

d. examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

e. scanning storage areas;

f. performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B;

g. searching for malware in order to evaluate defenses, such as viruses; and/or

h. performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

## ABILITY TO RETRIEVE DELETED FILES

49. Computer files or remnants of such files on traditional or conventional mechanical computer hard drives can typically be recovered months or even years after they have been downloaded onto the hard drive, deleted or viewed via the Internet. Electronic files downloaded to the hard drive or storage device can be stored for years at little or no cost. Even when such files

have been deleted, they can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files may reside in free space or slack space that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from these conventional types of hard drives depends less on when the file was downloaded or viewed than on the particular user's operating system, storage capacity, and computer habits.

50. Other than the conventional mechanical hard drives that are traditionally in computers, becoming more prevalent are flash memory based hard drives and devices. This technology has been traditionally used for small thumb drives where files and data are stored electronically but has since evolved and is being used in computer hard drives known as "solid state hard drives" or SSDs, which are also being used in cell phones and smart phones. These devices do not operate like mechanical hard drives when it comes to how files and data are stored and deleted. These devices can move data around on the drive to maximize storage space and

longevity of the drive, compress data, and may use different deletion techniques for how a deleted file is handled and overwritten. Because of how these flash, memory-based drives function it may limit how much data, if any, can be recovered from these types of devices.

## CONCLUSION

51. Based upon the information above I respectfully submit that there is probable cause to believe that violations cited herein have been committed and that evidence of those violations is located within the device described in attachment A. This evidence, listed in Attachment B to this affidavit, which is incorporated herein by reference, is contraband, the fruits of crime, or things otherwise criminally possessed, or property which is or has been used as the means of committing the foregoing offenses.

52. Therefore, I respectfully request that the attached warrant be issued for the location in Attachment A, authorizing the search and seizure of the items listed in Attachment B.

**FURTHER THE AFFIANT SAYETH NOT.**

Respectfully submitted,

Nicholas Miller
Special Agent
Bureau of Indian Affairs

Subscribed and sworn to before me this 30th day of January 2026.

AMANDA L. MAXFIELD
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

*Property to be searched*

The property to be searched is located at FBI Headquarters Oklahoma City Evidence Control Center, 3301 West Memorial Road, Oklahoma City, Oklahoma 73134. The property is described as an Amazon Tablet, Black in color, Model L5SB3A evidence item number 1B7.






amazon

## ATTACHMENT B

## ITEMS TO BE SEARCHED FOR AND SEIZED

Evidence of violations of 18 U.S.C. Sections 2251, 2252 and 2252A including the following:

1. All records on the Devices described in Attachment A that relate to violations of 18 U.S.C. §§ 1801, 2251(a), and/or 2252(a)(4) and involve CLYDE PARK CREWS III including:

a. Photographs and/or video recordings depicting minors engaged in sexually explicit conduct as defined by 18 U.S.C. § 2256(2);

b. Child pornography as defined by 18 U.S.C. § 2256(8);

c. Photographs and/or video recordings capturing images of a private area of an individual without their consent and where the individual has a reasonable expectation of privacy;

d. Data relating to the origin, ownership, and/or use of such materials; and/or

e. Data relating to the user's intent to access, possess, or produce such materials, including search histories.

2. Information, correspondence, records, documents or other materials pertaining to the possession, receipt or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or pertaining to the sexual exploitation of minors or a sexual interest in children, that were transmitted or received using computer, cellular device, personal digital assistant, or some other facility or means of interstate or foreign commerce, common carrier, or the U.S. mail including, but not limited to:

a. Correspondence including, but not limited to, electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256 or relating to the sexual exploitation of minors or a sexual interest in children;

b. Any and all electronic and/or digital records and/or documents pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate commerce including by United States mail or by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256 or relating to the sexual exploitation of minors;

c. Any and all electronic and/or digital records and/or documents including any and all address books, names, and lists of names and addresses of minors visually depicted while engaging in sexually explicit conduct, defined in Title 18, United States Code, Section 2256; or relating to the sexual exploitation of minors;

d. Any and all records of Internet usage including usernames and e-mail addresses and identities assumed for the purposes of communication on the Internet. These records may include billing and subscriber records, chat room logs, e-mail messages, and include electronic files in a computer and on other data storage mediums;

e. Any physical keys, encryption devices, dongles and similar physical items necessary to access computer equipment, storage devices or data.

f. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data;

3. Files, records, programs, logs, electronic communications, scanning programs, financial records, hacking software, or router configuration software;

4. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

5. Items or files containing or displaying passwords, access codes, usernames or other identifiers necessary to examine or operate items, software or information seized;

6. Correspondence, to include emails and chat logs, or other documents (whether digital or written) pertaining to the production, possession, receipt, origin, or distribution of images involving child pornography, children engaged in sexually explicit conduct, and/or video voyeurism; and

7. Any and all information, correspondence (including emails), records, documents and/or other materials related to contacts, in whatever form, with minors involving the production, possession and/or distribution of child pornography and the attempt or act of educing, enticing, coercing, or persuading a minor to engage in sexual acts.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including

any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.